KIRBY MCINERNEY LLP
Karina Kosharskyy (Bar No. 029362007)
250 Park Avenue
Suite 820
New York, NY 10177
Telephone: 212-699-1163
Email: kkosharskyy@kmllp.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>DAVID ARTHUR SHABSELS,<br><br>Debtor. | Chapter 11<br>Case No. 26-16530-CMG<br><br>Honorable Christine M. Gravelle |
| KIRBY MCINERNEY LLP,<br><br>Plaintiff,<br><br>v.<br><br>DAVID ARTHUR SHABSELS,<br><br>Defendant. | Adv. Proc. No. |

**<u>COMPLAINT FOR A DETERMINATION EXCEPTING DEBT FROM DISCHARGE</u>**

Plaintiff Kirby McInerney LLP ("Plaintiff"), counsel to Relators Karla and Ivan Bellotto in a False Claims Act, or *qui tam* litigation captioned as *United States ex rel. Karla and Ivan Bellotto v. Michael Shabsels et al.*, No. 24 Civ. 6494 (S.D.N.Y.) (the "FCA Action") pending before the Honorable Kenneth M. Karas in the United States District Court for the Southern District of New York (the "District Court") files this Adversary Complaint pursuant to 11 U.S.C.

523(a)(2), and (a)(6) objecting to the discharge of certain debts of David Arthur Shabsels ("Defendant") and respectfully alleges as follows:

**NATURE OF THE ACTION**

1. Through this adversary proceeding (the "Adversary Proceeding"), Plaintiff seeks a determination that Plaintiff's Claim for statutory attorneys' fees and costs against Defendant constitutes a non-dischargeable debt to Plaintiff pursuant to 11 U.S.C. § 523, and 31 U.S.C. §§ 3729, *et seq.* (the "False Claims Act" or "FCA"). The FCA prohibits, *inter alia*, (a) the presentation or causing the presentation of false and fraudulent claims; (b) making, using, or causing to be made or used false records material to false or fraudulent claims; and (c) conspiring to do the same. *See* 31 U.S.C. § 3729(a)(1). The FCA authorizes a person, commonly known as a *qui tam* "relator," to bring actions on behalf of governmental entities. 31 U.S.C. § 3730(b)(1). If such actions result in a recovery, the proceeds are allocated between the relator and the United States. *Id.* § 3730(d).

2. As more fully set forth below, Defendant's obligations arising from the claims asserted in the FCA Action satisfy the non-dischargeability provisions of § 523 because Defendant's debt was: (1) obtained by fraud and willful conduct, pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6), respectively; and (2) constitutes unliquidated and contingent statutory attorneys' fees and costs to the Plaintiff, assigned from the Relators, pursuant to the FCA. Consequently, the Claim arising from the FCA Action is not dischargeable through this Chapter 11 Case.

3. Plaintiff's Claim against Defendant in the Chapter 11 Case is the subject of a timely filed proof of claim, which was subsequently amended, based on Defendant's violations of the FCA through his active involvement in fraudulently obtaining first- and second-draw PPP loans for his day camp businesses. Under his fraudulent scheme, Defendant obtained PPP loan payments,

which were subsequently forgiven, including interest and lender fees, from the Government by false statements, misrepresentations, and other fraudulent misconduct.

4. Federal Rule of Bankruptcy Procedure 4007 authorizes any creditor to "file a complaint to obtain a determination of the dischargeability of any debt." Through this Adversary Proceeding, Plaintiff seeks a determination that the Claim arising from the FCA Action is not dischargeable.

## **BACKGROUND**

5. On June 10, 2026, Defendant commenced this Chapter 11 Case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of New Jersey (the "Court").

6. On August 5, 2026, Plaintiff filed a motion in the FCA Action asking Judge Karas to lift the seal on the FCA Action to assist Plaintiff in filing timely proofs of claim in this action.

7. On August 13, 2026, prior to Judge Karas ruling on the motion to lift the seal, Plaintiff timely filed an unliquidated and contingent proof of claim against the Defendant (Claim No. 90) (the "Original Proof of Claim"). In order to comply with the District Court's seal in the FCA Action, Claimant's Original Claim did not identify the FCA Action. The Claim arises from the allegations asserted in the Relators' Complaint. While unliquidated and contingent, Plaintiff estimates that Defendant is liable for Plaintiff's statutory attorneys' fees, expenses, and costs, of approximately $276,855.68, consisting of $275,702.50 in attorneys' fees and $1,153.18 in costs.

8. On August 17, 2026, Judge Karas granted Plaintiff's motion and lifted the seal on the case and unsealed previously filed documents, including Relators' Complaint, dated August 8, 2024.

9. On August 24, 2026, the Government filed its Notice of Intervention and its Complaint in Intervention against the Debtors and additional defendants.

10. On September 12, 2026, Plaintiff filed an amended proof of claim to provide additional support and background information with respect to the Original Claim, disclosing the existence and allegations of the FCA Action.

## **JURISDICTION AND VENUE**

11. This Adversary Proceeding is governed by Fed. R. Bank. P. 7001, *et seq.*, and seeks a declaration that Plaintiff's claim against Defendant to recover statutory attorneys' fees and expenses under the FCA is not dischargeable pursuant to 11 U.S.C. § 523.

12. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

13. This Adversary Proceeding is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

14. In the event that any portion of this Adversary Proceeding is found to be "noncore," Plaintiff reserves its rights with respect to the entry of final orders and judgments by this Court pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

15. Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

16. The statutory and legal predicates for the relief sought herein are 11 U.S.C. §§ 523, Bankruptcy Rules 4004, 4005, 4007, and 7001 *et seq.*, and the FCA.

## **THE PARTIES**

17. Plaintiff is a law firm with offices in New York, New York, Chicago, Illinois, and San Diego, California. Plaintiff is counsel to the Relators in the FCA Action. Plaintiff filed the FCA Complaint on behalf of the Relators on August 8, 2024. Plaintiff has standing to bring this action pursuant to 31 U.S.C. § 3730(d), which provides for, among other things, an award of statutory fees to the Relator in a successful action. Relators have assigned to Plaintiff any claim for statutory fees in the FCA Action.

18. Defendant David Shabsels is an individual residing in the State of New York. David Shabsels, together with his brother Michael Shabsels, owns a majority interest in a series of day camps and sleepaway camps, almost all of which are debtors in other bankruptcy proceedings before this Court. David Shabsels, together with his brother Michael Shabsels, also owns and controls two camp holding companies, Simad Holdings LLC and Damis Holdings LLC.

## FACTUAL ALLEGATIONS

### I. The Paycheck Protection Program

19. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") (Pub. L. 116-136) became law. Congress aimed to provide fast and direct economic assistance to American workers, small businesses, and industries affected by the COVID-19 pandemic. Among other things, it authorized the SBA to guarantee loans under its primary loan program (the § 7(a) Loan Program) under a new program titled the "Paycheck Protection Program."

20. On April 24, 2020, the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) became law. It provided additional funding and authority for the PPP.

21. On June 5, 2020, the Paycheck Protection Flexibility Act of 2020 (Pub. L. 116-142) became law and modified certain provisions of the PPP, including provisions about forgiveness of the loans.

22. In December 2020, the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Pub. L. 116-260) became law. It modified and extended the PPP.

23. The PPP disbursed loans in two rounds, a first draw in 2020, and a second draw in 2021.

24. The SBA delegated authority to third-party lenders to underwrite and approve the PPP loans. In order to obtain a PPP loan, a qualifying business was required to sign and submit a PPP loan application through the lender's application platform.

25. The third-party lenders processed the PPP loan applications and, upon approving a loan, used their own monies to fund the loans which were fully guaranteed by the SBA.

26. Lenders who processed and approved a borrower's PPP loan application submitted to the SBA the "Lender's Application - Paycheck Protection Program Loan Guaranty," by which they applied for a guarantee on the loan. On this form, the lenders repeated information provided by the borrower.

27. The CARES Act and subsequent legislation provided for forgiveness of first- and second-draw PPP loans. To receive forgiveness, borrowers were required to submit signed loan forgiveness applications.

28. The PPP loans were available only to small business concerns as defined by the SBA's size standards, which addressed the size of the applicant together with all of its affiliates.

29. For purposes of PPP loans, an applicant was considered an affiliate of another business if, among other things, a third party controlled or had the power to control both businesses. Control could be established through ownership, management, previous relationships, identity of interests, or contractual relationships. *See* 13 C.F.R. § 121.103(a)(6).

30. For a business to be eligible for a first-draw PPP loan, it and its affiliates must have had 500 or fewer employees or, if they had more than 500 employees, it must have met the SBA industry size standard.

31. On the application form for the first-draw PPP loans, the applicant was required to certify that it "employs no more than the greater of 500 employees, or, if applicable, the size

standard in number of employees established by the SBA in 13 C.F.R. 121.201 for the Applicant's industry."

32. For a business to be eligible for a second-draw PPP loan, it and its affiliates must have had 300 or fewer employees. On the application form for the second-draw PPP loans, the applicant was required to certify that its number of employees, including affiliates, did not exceed 300.

33. In addition, on the application form for the second-draw PPP loans, the applicant was required to certify the following:

> The Applicant, together with its affiliates (if applicable), (1) is an independent contractor, self-employed individual, or sole proprietor with no employees; (2) employs no more than 300 employees; or (3) if NAICS 72, employs no more than 300 employees per physical location; (4) if a news organization that is majority owned or controlled by a NAICS code 511110 or 5151 business or a nonprofit public broadcasting entity with a trade or business under NAICS code 511110[1] or 5151, employs no more than 300 employees per location.

34. The application form for both the first- and second-draw PPP loans required that the applicant certify that, among other things, "the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

## II. The FCA Action

35. On August 8, 2024, Relators brought the FCA Action on behalf of themselves and the United States of America (the "Government") under the FCA and sought damages arising from millions of dollars of PPP loans to Defendant's affiliated set of day camp businesses that were falsely obtained and forgiven.

[1] The industry of each Day Camp Defendant is the industry described by North American Industry Classification System ("NAICS") code 713990. The SBA regulations at 13 C.F.R. § 121.201 do not set a standard in number of employees for NAICS code 713990, so no such standard is applicable to the Day Camp Defendants.

36. The PPP loans at issue were obtained by Defendants Kiwi Operatingco LLC, Willow Lake Day Camps LLC, Country Roads Operatingco LLC, Mohawkcampco LLC, Banner Operatingco LLC, Meadowbrook Operatingco LLC, and Eagle's Landing Day Camp LLC (the "Day Camp Defendants").

**A. Defendants Made Claims That Were False**

37. Relators alleged that each of the Day Camp Defendants, with the knowing and active participation of Michael Shabsels, David Shabsels, Randolph Mittasch, and the Shabsels' holding companies Simad Holdings LLC and Damis Holdings LLC, made false applications for the PPP loans that concealed the Day Camp Defendants' affiliations with one another and with other businesses. They further caused other false records and statements to be made to get their PPP loans made and forgiven.

38. Relators alleged that the loan applications and other records and statements were false because they asserted that one or more of the Day Camp Defendants was eligible for the PPP loans, when the businesses were not eligible because they and their affiliates collectively had more than 500 or 300 employees.

39. Each of the Day Camp Defendants falsely applied for first- and second-draw PPP loans and applied for the forgiveness of those loans using application forms prepared by the SBA.

40. The application of each Day Camp Defendant was prepared by or with the involvement of David Shabsels, acting on behalf of each Day Camp Defendant.

41. Between about March and May 2020, each of the Day Camp Defendants submitted an application for a first-draw PPP loan.

42. On its application for a first-draw PPP loan, each Day Camp Defendant, acting through those individuals, represented that it employed no more than the greater of 500 employees

or, if applicable, met the size standard in number of employees established by the SBA in 13 C.F.R. § 121.201 for its industry.

43. On its application for a first-draw PPP loan, each Day Camp Defendant falsely responded "no" to the question "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management with, any other business? If yes, list all such businesses and describe the relationship on a separate sheet identified as addendum A." None of the Day Camp Defendants provided a separate sheet identifying any such businesses.

44. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendants' first-draw PPP loan application that the information provided in the application and the information provided in all supporting documents and forms was true and accurate in all material respects.

45. Between about January and March 2021, each of the Day Camp Defendants submitted applications for second-draw PPP loans.

46. On its application for a second-draw PPP loan, each Day Camp Defendant falsely certified to the lender that it had fewer than 300 employees.

47. On its application for a second-draw PPP loan, each Day Camp Defendant falsely responded "no" to the question "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any other business? If yes, list all such businesses (including their TINs if available) and describe the relationship on a separate sheet identified as addendum A." None of the Day Camp Defendants provided a separate sheet identifying any such businesses.

48. The authorized representative of each Day Camp Defendant certified on the Day Camp Defendants' second-draw PPP loan application that the Day Camp Defendant was eligible

to receive a loan under the rules in effect at the time the application was submitted that had been issued by the SBA in implementing the PPP.

49. Upon information and belief, each Day Camp Defendant represented on its second-draw PPP application form that its applicable NAICS code was 721214.

50. NAICS code 721214 describes the industry for sleepaway camps, because they include overnight accommodations. The code is not applicable to day camps like the Day Camp Defendants.

51. Defendants misrepresented the Day Camp Defendants' NAICS codes on the applications because PPP borrowers with 500 or fewer employees in industries with NAICS codes beginning with the digits "72" did not need to apply the SBA's affiliation rules. The Day Camp Defendants were not in an industry with a NAICS code beginning with the digits "72," so the affiliation rules applied to them and the Day Camp Defendants' eligibility for PPP loans was based on, among other things, whether each one, together with its affiliates, had more than 500 employees (for first-draw PPP loans) or 300 employees (for second-draw PPP loans).

52. In applying for forgiveness of its first- and second-draw PPP loans, each Day Camp Defendant represented that it had fewer than 500 and 300 employees, respectively.

53. Each Day Camp Defendant, on its application for forgiveness of its first- and second-draw PPP loan did not check the box included with the text "If Borrower (together with affiliates, if applicable) received PPP loans in excess of $2 million, check here: □."

54. The first and second-draw PPP loans made to each of the Day Camp Defendants, together with interest on them, were forgiven. None of the Day Camp Defendants repaid their first- and second-draw PPP loans.

55. By seeking and receiving the first- and second-draw PPP loans for the Day Camp Defendants, and by seeking and receiving their forgiveness, Defendants presented, or caused to be presented, false claims for payment. They further made and used, or caused to be made or used, false records or statements that were material to the false claims.

56. At the time of each Day Camp Defendant's application for a first-draw PPP loan, the Day Camp Defendants collectively had 573 employees, which is more than 500 employees. At the time of each Day Camp Defendant's application for a second-draw PPP loan, the Day Camp Defendants collectively had 477 employees, which is more than 300 employees.

57. Each Day Camp Defendant's application for a first- and second-draw PPP loan was also false because on each application the Day Camp Defendant answered "no" to the question that asked, "Is the Applicant or any owner of the Applicant an owner of any other business, or have common management (including a management agreement) with any other business?" These responses were false because each Day Camp Defendant each had common management with the other day camps owned and controlled directly or indirectly by Michael and David Shabsels.

58. Each Day Camp Defendant's application for a first and second-draw PPP loan was also false because it contained a certification by the Day Camp Defendant's authorized representative that the Day Camp Defendant was eligible to receive a loan under the rules in effect at the time the application was submitted that had been issued by the SBA, when it was not eligible. Further, each Day Camp Defendant's authorized representative certified that the information provided in each application for the first- and second-draw was true and accurate when it was not.

59. The Day Camp Defendants' applications for forgiveness of the first- and second-draw PPP loans were also false.

60. On its loan forgiveness application, each Day Camp Defendant falsely indicated that it, together with its affiliates, had not received PPP loans of more than $2 million. In fact, each Day Camp Defendant together with its affiliates had received PPP loans of more than $2 million.

61. On its loan forgiveness application, each Day Camp Defendant's authorized representative falsely certified that the information in the form was true and accurate, when the information was not true and accurate because it misrepresented the amount of PPP loans to each Day Camp Defendant together with its affiliates.

**B. Defendants Acted Knowingly and Materially Harmed the Government**

62. Defendants, including David Shabsels, knew that the loan applications and other records and statements were false because they knew both about their own affiliations and about the businesses' numbers of employees. Specifically, they knew that the Shabsels directly or indirectly owned more than 50% of the Day Camp Defendants and of a series of other businesses that operated sleepaway camps, and that those businesses employed well in excess of 500 persons.

63. If Defendants had honestly disclosed the true number of employees, the PPP loans would not have been given or forgiven.

64. As a result of their scheme, Defendants violated 31 U.S.C. §§ 3729(a)(1)(A)-(C) of the False Claims Act. Defendants defrauded the federal Government by knowingly making materially false claims to receive PPP loans. The federal Government guaranteed and then forgave PPP loans, with interest, for which the Defendant Day Camps were ineligible. The Government also paid lender processing fees that were based on the amounts loaned. Relators estimated that the single damages arising from the Defendants' violations of the FCA are approximately $13,660,178.36 and thus constitute approximately $40,980,535.08 in trebled damages.

**III. Plaintiff's Reasonable Attorneys' Fees and Costs**

65. Relators have assigned Plaintiff its right to receive any award of reasonable attorneys' fees, costs, and expenses pursuant to an engagement agreement executed on August 8, 2024. Therefore, if the Relators or the Government prevail in the FCA Action, Plaintiff is entitled to recover reasonable attorneys' fees, expenses, and costs from the Defendant. 31 U.S. Code § 3730(d).

66. Plaintiff's pre-petition statutory attorneys' fees, expenses, and costs are approximately $276,855.68, consisting of $275,702.50 in attorneys' fees and $1,153.18 in costs.

67. Plaintiff's fees were reasonably incurred in preparing, filing, and pursuing the FCA Action. Plaintiff, as counsel for Relators, performed a broad range of legal services in connection with the FCA Action, including reviewing and analyzing relevant factual and legal issues; conducting legal research; preparing the FCA Complaint; preparing a Disclosure Statement and the evidence of Defendants' violations; communicating with the Relators; maintaining contact and coordination with Assistant U.S. Attorneys assigned to the FCA Action; participating in conferences and interviews regarding the allegations in the FCA Action, including the Government's interviews of the Relators; monitoring and managing the FCA Action's procedural requirements and deadlines; and performing such other legal and administrative tasks as were necessary to advance the Relators' and Government's interests in pursuit of the FCA Action.

68. The work Plaintiff performed on the FCA Action was all related to and intertwined with the facts and transactions underlying the FCA Action, and with the resulting claims that the Defendants in the FCA Action, including Defendant here, made or caused to be made false representations to the Government in obtaining PPP loans and the forgiveness of such loans.

69. Plaintiff's fees are based on the hours it expended on the FCA Action multiplied by normal hourly rates for the attorneys and staff that worked on the matter. The hourly rates are

consistent with rates charged in the Southern District of New York for work on similar matters by attorneys and staff of similar experience.

**COUNT 1**

**Declaratory Judgment that the Claim is Nondischargeable under 11 U.S.C. § 523(a)(2)(A) (Fraud)**

70. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

71. 11 U.S.C. § 523(a)(2)(A) excepts from discharge in a Chapter 11 case, a debt for money, property, or services to the extent it is obtained by false pretenses, false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. "Debt" means a liability on a claim. 11 U.S.C. § 101(12).

72. "Claim" is defined to include, in relevant part, "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

73. The representations made or caused to be made by Defendant to the Government in obtaining PPP loans and their forgiveness, were false.

74. The Government justifiably relied on the representations made or caused to be made by Defendant and his day camps in providing the PPP loans and later forgiving them.

75. Defendant knew the representations were false at the time he made them or caused them to be made to the Government or he knew the representations were made with reckless disregard for the truth and made with the intent to deceive. Defendant's conduct described above constitutes obtaining money or property by actual fraud.

76. Plaintiff's claim for attorneys' fees and costs is directly related to and intertwined with the violations of the False Claims Act alleged in the FCA Action.

77. Based upon the foregoing, the debt due to the Plaintiff from Defendant in the amount of approximately $276,855.68 should not be discharged.

**COUNT 2**

**Declaratory Judgment that the Claim is Nondischargeable under 11 U.S.C. § 523(a)(6) (Willful Injury)**

78. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

79. 11 U.S.C. § 523(a)(6) excepts from discharge in a Chapter 11 case, a debt for willful and malicious injury by the debtor to another entity or to the property of another entity.

80. "Debt" means a liability on a claim. 11 U.S.C. § 101(12).

81. "Claim" is defined to include, in relevant part, "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

82. Defendant's conduct alleged in the FCA Action was deliberate and targeted conduct intended to procure PPP loans and loan forgiveness for his businesses that Debtor knew or should have known were ineligible.

83. Defendant's wrongful conduct caused willful and malicious injury to the Government and its interests because he knew that the first- and second-draw PPP loan applications contained false certifications and representations in order to obtain Government funds.

84. Plaintiff's claim for attorneys' fees and costs is directly related to and intertwined with the violations of the False Claims Act alleged in the FCA Action.

85. Based upon the foregoing, the debt due to the Plaintiff from Defendant in the amount of approximately $276,855.68 should not be discharged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the entry of a judgment by the Court:

(1) Declaring that the Claim is a nondischargeable debt owed to Plaintiff pursuant to 11 U.S.C. §§ 523 and 31 U.S.C. § 3730(d);

(2) Awarding Plaintiff its costs and reasonable attorney fees incurred in the FCA Action; and

(3) Granting such other relief as the Court deems just and proper.

## RESERVATION OF RIGHTS

This Adversary Complaint is not intended, and shall not be construed, as a waiver of the Plaintiff's rights, to: (i) continue litigating the FCA Action captioned as *United States ex rel. Karla and Ivan Bellotto v. Michael Shabsels et al.*, No. 24 Civ. 6494 (S.D.N.Y.); (ii) assert additional causes of action unrelated to the causes of action set forth herein in both this Adversary Proceeding and the FCA Action, including, but not limited to, counterclaims, other causes of action, objections, contests, or defenses; (iii) seek to have the determinations requested herein made by an appropriate District Court through withdrawal of the reference or otherwise; or (iv) further amend this Complaint to assert different or additional causes of action relating to the causes of action set forth herein to the extent such amendment is appropriate.

Dated: September 15, 2026

Respectfully submitted:

**KIRBY MCINERNEY LLP**

/s/ Karina Kosharskyy
Karina Kosharskyy (Bar No. 029362007)
250 Park Avenue
Suite 820
New York, NY 10177
Telephone: 212-699-1163
Email: kkosharskyy@kmllp.com

/s/ Randall Fox
Randall M. Fox (*pro hac vice* application forthcoming)
250 Park Avenue
Suite 820
New York, NY 10177
Telephone: 212-699-1140
Email: rfox@kmllp.com

*Counsel for Plaintiff Kirby McInerney LLP*